Joseph F. **ELWARD**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 73 C 3240.

United States District Court,
N. D. Illinois, E. D.

Sept. 30, 1976.

Edward S. Macie, Chicago, Ill., for plaintiff.

Scott P. Crampton, Asst. Atty. Gen., Edward J. Snyder, Robert M. Greco, U. S. Dept. of Justice, Washington, D. C., Stanley Kubacki, Asst. U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This is an action brought by plaintiff, Joseph F. Elward, against defendant, United States of America, for the recovery of federal income taxes paid by plaintiff for the year 1966. No question is raised as to plaintiff's right to maintain the action and jurisdiction is not disputed. The center of the controversy is the proper cost basis of common stock in Chicago and West Towns Railways, Inc. which plaintiff received in 1954 pursuant to a reorganization and which he sold in 1966.

Plaintiff was a bond holder in West Towns, acquiring his holdings over a period of years beginning in 1947. By July, 1954, plaintiff had acquired 4,895 bonds (face value $100) at a cost of $299,404.21. Pursuant

to a plan of reorganization approved by the United States District Court for this district, Honorable Walter J. LaBuy presiding, on August 25, 1953, the following tax free exchange was effected: for each $100 face bond, there would be issued a new $65 face bond, plus 3.5 shares of no par value common stock. The reorganization became effective July 1, 1954, and in exchange for his 4,895 bonds, plaintiff received 4,895 new bonds ($65 face value), plus 17,132.5 shares of new no par value common stock.

During the period August 1, 1954 to January 21, 1966, plaintiff acquired 11,238 additional shares of common stock at a total cost of $36,181.20, and 1,141 additional bonds at a total cost of $100,731.91. Nine hundred shares of the stock were purchased on October 8, 1954 at $2.07 and 1,000 shares were purchased on November 11, 1954 at $2.25.

On January 31, 1966 plaintiff sold his entire holding of 28,370.5 shares of common stock for $794,360. On his 1966 tax return he reported the basis of the 17,132.5 shares which he had acquired in the reorganization as $299,404, i. e., he allocated the entire cost of the old bonds which he had purchased between 1947 and 1954 to the shares issued to him in the reorganization. This resulted in the following reported capital gain:

| | |
|---|---|
| Selling price—17,132.5 shares | $479,710 |
| 100% basis in "old" bonds | 299,404 |
| Capital gain on sale of re-organization shares | $180,306 |

Upon audit of the return, the Internal Revenue Service redetermined the basis of the reorganization shares allocating the total cost of the old bonds purchased by plaintiff and exchanged for new bonds and the reorganization shares in the following manner: 89.6816% of the cost of the old bonds was allocated to the new bonds and 10.3184% of the cost was allocated to the reorganization shares. The source of the allocation ratio was the Capital Changes Reports, a publication of Commerce Clearing House. This produced a capital gain as follows:

| | |
|---|---|
| Selling price—17,132.5 shares | $479,710 |
| Basis (10.3184% of $299,404) | 30,898 |
| Capital gain on sale of re-organization shares | $448,812 |

Plaintiff filed a timely claim for refund alleging an overpayment of tax resulting from the alleged improper basis attributed by the Internal Revenue Service to the reorganization stock. In his claim for refund plaintiff used an allocation ratio of 65% for the bonds and 35% for the stock issued in the reorganization. That would result in the following capital gain:

| | |
|---|---|
| Selling price—17,132.5 shares | $479,710 |
| Basis (35% of $299,404) | 104,791 |
| Capital gain on sale of re-organization shares | $374,919 |

■ The Commissioner of Internal Revenue denied plaintiff's claim for refund and this action was brought. The burden is upon plaintiff to prove that the cost basis determined by the Commissioner does not fairly reflect the fair market of the reorganization stock.

■ Plaintiff first contends that he is entitled to employ the unit rule as the cost basis for the reorganization stock. Under this concept where an apportionment or allocation of basis or fair market value among a group of securities such as stocks and bonds cannot be established, the taxpayer is entitled to recoup his original investment before reporting any taxable gain. *Hamilton & Main, Inc. v. Commissioner*, 25 T.C. 878, 883 (1956); *United Mercantile Agencies, Inc. v. Commissioner*. 23 T.C. 1105 (1955); remanded *sub nom. Drybrough v. Commissioner*, 238 F.2d 735 (6th Cir. 1956); 3A Mertens, *Law of Federal Income Taxation,* § 21.32. Thus, plaintiff urges that allocation here is not feasible and he is entitled to ascribe as his cost his initial investment of $299,404 in pre-reorganization bonds.

■ The unit concept of cost and deferred recognition is an exception applicable only where allocation is not feasible.

Where there is no lack of a proper rational or reasonable basis for allocating to each individual item a part of the cost of the whole, then the unit rule should not be applied. *Madison Fund, Inc. v. Commissioner,* 43 T.C. 215, 232 (1964), *aff'd,* 365 F.2d 471 (3d Cir. 1966). For the reasons hereinafter stated, we believe that allocation is feasible in this case with the result that plaintiff is not entitled to unit rule treatment.

No actual sales of the bonds and stock issued as a result of the reorganization occurred until September 7, 1954. However, bid and ask quotations were made by prospective buyers on July 30, 1954 for the bonds and August 3, 1954 for the stock. These bid and ask prices, the evidence at trial showed, were used by the compilers of Capital Changes Reports which were relied upon by the Commissioner in determining the allocation ratio to be applied to plaintiff's holdings.

The July 30, 1954 bid and ask for the bonds was 57–60. It is the custom in the bond market to quote prices as a percent of face value. Thus a bid of 57 is 57% of face, and an ask of 60 is 60% of face. The mean of the 57–60 was 58.5 which when multiplied by the face of $65 for the new bonds equalled a value of 38.03 per bond. On October 8, 1954 plaintiff purchased bonds at 39.81.

The August 3, 1954 bid and ask on the reorganization stock was 1–1½. The mean market price was 1¼. In October and November, 1954 plaintiff purchased reorganization stock at $2.07 and $2.25.

Plaintiff maintains that the bid and ask on the stock (as evidenced by the National Monthly Stock Summary issued by the National Quotation Bureau, which is in evidence) were dealer bids and asks designed to generate a market. He asserts this is so by the designation "D" appearing opposite the entry for August 3, 1954. Defendant's expert Green challenged that contention when it was put to him during cross examination. He asserted that the "D" stood for daily. The conflict has not been resolved for us.

Defendant's expert, Green, gave no credit to either the extent of plaintiff's holdings nor the findings made by the district court in approving the plan of reorganization in 1953. We will have more to say in respect to those findings momentarily.

■ Under the provisions of §§ 358(b), 371, and 2031(b) of the Internal Revenue Code of 1954 and Treasury Regulations on Income Tax § 1.358–2(3), and 2.2031–2(a), (c), (d) and (e), all of which are applicable to this problem of allocation, the Commissioner was justified in going to the bids and asks to determine allocation, there being no actual sales in point of time closer to the date of plaintiff's acquisition of the stock. This is subject, however, to the Commissioner's failure to take into account the extent of plaintiff's holdings and the findings of the district court in the reorganization.

■ As to the former—the extent of plaintiff's holdings—we think it clear that he did hold a controlling interest in West Towns and we recognize that on occasion control enhances the value of stock. But the instances to which we are cited by plaintiff all involve prosperous organizations. West Towns was anything but that. While its subsequent financial success and plaintiff's ability to sell his shares at a substantial profit may show him to have been a prophet in 1954, they are not, in our opinion, relevant considerations to a determination of the market value of plaintiff's shares when he acquired them. The fact is that he held controlling shares in a financially sick business.

We cannot, however, give such short treatment to plaintiff's ultimate position and that is that the value ascribed to the common shares at the time of the reorganization by the district court was $10 per share and should mark the cost basis for plaintiff's reorganization stock.

At the time of the reorganization West Towns had outstanding the following securities:

First Mortgage 5% Income Bonds in the principal sum of $2,148,200, maturing

July 1, 1947, with interest arrearages in excess of $900,000;

First Preferred 6% stock in the sum of $1,000,000;

Second Preferred 8% stock in the sum of $210,000;

Common stock in the sum of $1,000,000. Under the plan of reorganization First Mortgage bond holders were to receive one new First Mortgage 6% bond in the face amount of $65 for each $100 of old bonds, plus 35 shares of new common stock. See Plan of Reorganization, p. 9. All remaining securities were to be cancelled and the claims of all creditors having general and unsecured claims were to be declared without value, and the holders not entitled to participate in the plan. The plan did contemplate, however, that the new company would assume all equipment obligations of the debtor. Plan of Reorganization, p. 8.

The Plan of Reorganization included a balance sheet of West Towns as of February, 1953 showing depreciated bus equipment at $1,106,845.97, other operating property (i. e., bus barns and terminals) at a depreciated value of $398,239.19, non-operating property depreciated to $13,024.80 and current assets of $303,804. Included in the latter were materials and supplies at cost of $119,149.06 and prepaid insurance and licenses at $76,065.85.

The Plan of Reorganization also disclosed that West Towns' real estate had been appraised in March, 1950 at $562,500.

In its findings of fact, conclusions of law and order approving the Plan of Reorganization, the district court found, "The fair value of all properties and assets of the debtor for all purposes herein is in excess of $2,000,000 . . . ." Finding 11. As ultimately consummated the reorganization plan resulted in the issuance of 3.5 shares of new common stock rather than 35 shares to each holder of $100 face value old bonds.

On the basis of the foregoing, plaintiff and his experts assert that the district court in effect found that the fair value of the

common stock issued to the old bond holders was $10 per share. "The Chicago Real Estate Board valued the Company's depot at $562,000, even higher than the firm's balance sheet value, which was $398,000. The bus fleet was valued at $1,106,846. The Chicago Transit Authority estimated furniture, tools, parts and equipment at $134,000.[1] And in February, 1953, there were sound current assets of $303,804. These independent appraisals total $2,106,-650 . . . ." Br. p. 40.

Plaintiff concludes that while the reorganization stock was of no par value, it had a stated value of $10 per share arrived at through the following computations:

| | |
|---|---|
| 21,248 new First Mortgage Bonds at 65 | $1,381,120 |
| 74,368 shares of no par stock at a stated value of $10 per share | 743,680 |
| Total value of new securities | $2,124,800 |
| Total value of all old First Mortgage Bonds replaced by the foregoing | $2,124,800 |

Thus plaintiff contends that the value of the assets as presented in the Plan of Reorganization and approved by the district court marked the value of the new securities issued in the reorganization. While not characterized as book value, that is really what plaintiff urges. The fallacy of this contention, however, lies in the fact that plaintiff does not take into consideration the liability of $423,666.88 in equipment obligations (i. e., conditional sales contract claims) which existed against West Towns' transportation equipment. As previously noted, this obligation was not to be discharged. Plan of Reorganization, p. 8.

Taking the net asset valuation of the balance sheet of $1,844,469.20, deducting from it the $423,666.88 in equipment obligations and $1,381,120 in new bond obligations leaves a net worth of $39,682.32, or 53.3¢ per share of new common stock. Should we increase the assets by $164,260.81 by substituting the 1950 real estate appraisal of $562,000, the net worth is $204,493.13 or $2.74 per share of new stock.

1. The Chicago Transit Authority had appraised West Towns' miscellaneous equipment at

$134,221.15 as of March 3, 1950. Plan of Reorganization, p. 24.

Thus, even if we were to accept the district court's finding that the value of West Towns' assets as of reorganization exceeded $2,000,000, we do not arrive at a stated value or a book value or a market value of $10 per share for the newly issued common stock. And because the range of book value as we have demonstrated was between 53.3¢ and $2.74 per share, we cannot conclude that the Commissioner's failure to take the ingredients and approval of the Plan of Reorganization into account was fatal to his allocation.

As we noted at the outset, the burden is upon the plaintiff to show that the Commissioner's allocation is erroneous and does not reflect the fair market value of the stock in question as of the date of its issuance to plaintiff. For the foregoing reasons which will stand as our findings and conclusions pursuant to Rule 52(a), *Fed.R.Civ.P.*, we conclude that plaintiff has failed to sustain his burden. Accordingly, judgment will enter against the plaintiff, Joseph F. Elward, and in favor of the defendant, United States of America.